# UNITED STATES DISTRICT COURT
## District of Kansas
(Topeka Docket)

FILED IN OPEN COURT
5/14/2015
TIMOTHY M. O'BRIEN, CLERK
BY_____M. Garrett_____
DEPUTY CLERK

UNITED STATES OF AMERICA,

Plaintiff,

CASE NO.   13-40060-12-DDC

v.

WALTER BERNARD TAYLOR,

Defendant.

# PLEA AGREEMENT
(Fed.R.Crim.P. 11(a))

The United States of America, by and through Anthony W. Mattivi, Assistant United States Attorney for the District of Kansas, and the defendant, Walter Bernard Taylor, personally and by and through counsel, Kevin Babbit, hereby enter into the following plea agreement pursuant to Rule 11 of the Federal Rules of Criminal Procedure:

1.    **Defendant's Guilty Plea**.   The defendant agrees to enter a plea of guilty to a Superseding Information charging him with conspiring to distribute cocaine base (crack cocaine), in violation of Title 21, United States Code, Section 846.   By entering into this plea agreement, the defendant admits to knowingly committing this offense and to being guilty of the offense.   The defendant understands the sentences that may be imposed under the charge to which he has agreed to plead guilty are a term of imprisonment for not more than twenty (20)

years (21 U.S.C. § 841(b)(1)(C)), a fine not to exceed the greater of that authorized in accordance with 18 U.S.C. § 3571(b)(3) or $1,000,000 (21 U.S.C. § 841(b)(1)(C)), a term of supervised release of at least three (3) years (21 U.S.C. § 841(b)(1)(C)), and a mandatory special assessment of $100 (18 U.S.C. § 3013(a)(2)(A)).

2.   **Factual Basis for the Guilty Plea.**   The parties agree the facts constituting the offense to which the defendant is pleading guilty are as follows:

> In late 2012 and early 2013, agents of the Kansas Bureau of Investigation (KBI) and detectives from the Junction City Police Department (JCPD) were investigating a sizeable crack cocaine trafficking organization in the Junction City and Manhattan area.   Several months of investigation, including court-authorized wiretaps of seven different telephone lines, revealed that the organization was led by Albert Banks ("AB") and Anthony Thompson ("Ant").   Banks and Thompson had numerous distributors or dealers operating in the Junction City and Manhattan area, and intercepted telephone calls revealed that they were moving as much as nine ounces of crack cocaine per week through their network of dealers.   Banks and Thompson were distributing enough crack cocaine that no single one of their suppliers was able to provide them with enough product.   The wiretaps revealed that Banks and Thompson were using at least three different suppliers of cocaine.

> ~~During the early stages of the investigation, the KBI used a confidential informant (CI) to purchase crack cocaine from the defendant.~~   During later stages of the investigation, the KBI used a wiretap to intercept calls to and from several target telephones.   One of the intercepted phones was registered to co-conspirator Glenda Roberson but was used by co-conspirator and co-defendant Albert Banks. At one point in approximately March of 2013, this defendant took over the use of Banks' phone and began using it on Banks' behalf to take and fill orders for crack cocaine.   During some of the phone calls, during which the distribution of crack cocaine was discussed, the defendant identified himself as Bernard or was observed by surveillance meeting with the associated purchaser of illegal narcotics.       On at least one occasion, the defendant also used the cellular telephone of co-defendant and co-conspirator Anthony Thompson to set up a drug transaction.   The following are several examples of these types of transactions:

> On March 26, 2013, at approximately 11:49am, the defendant used 785-375-6704 to call co-defendant and co-conspirator Barbara Johnson (Barbara Shaw) at 785-341-4453 (call #7612).   Johnson told the defendant that she would pay him his money.   The defendant identified himself during the call as "Bernard."

At approximately 1:48pm that same day, the defendant used 785-375-6704 to call co-defendant and co-conspirator Patricia Foy at 785-317-7682 (call #7688).   The defendant told Foy that he was collecting for "AB."

At approximately 4:55pm that same day, the defendant answered a call on 785-375-6704 from 785-477-8570, which was registered to Gregory Mark Roberts (call #7761).   Roberts said, "What up, fool?"   The defendant responded, "This ain't AB."   Roberts replied that he knew it wasn't Banks. The defendant asked who it was.   Roberts told the defendant that he was with "Paul" the other night when the defendant was at Foy's house.   The defendant told Roberts that he wasn't there, and that he was "AB's cousin."   Roberts told the defendant that AB knows him and that he was "trying to pick up something." The defendant asked what Roberts wanted.   Roberts replied, "A 70" (meaning .7 grams of crack cocaine).   The defendant and Roberts then exchanged locations. Surveillance agents observed Banks' gold vehicle arrive in the area occupied by two black males.

On March 27, 2013, at approximately 12:23pm, the defendant received the following text message on 785-375-6704 from Barbara Johnson on 785-341-4453 (call #8170):   "40" (meaning she wants .4 grams).   Johnson called two minutes later (call #8176) and asked the defendant if he would bring a 40 (.4 grams) over to Rose's house.   Johnson told the defendant that nobody was there except her "and a dude."   The defendant responded that he would be there in a minute, but he then called back and asked Johnson to come to him.   The defendant told Johnson to call him when she got to 3rd and Franklin St.   Johnson called the defendant six minutes later and told him she would be right there.

On March 28, 2013, at approximately 2:10pm, the defendant received a call on 785-375-6704 from Barbara Johnson on 785-341-4453 (call #8740).   Johnson told the defendant she "has 40" (meaning $40).   The defendant told Johnson he would be there in a minute.   In another call shortly thereafter, the defendant asked Johnson if she "needs that 40" (this time meaning .4 grams of crack cocaine).   Johnson replied that she did.   The defendant said everything he had was going for "20 strong a piece."   Johnson and the defendant proceeded to argue about price, and then she asked the defendant where she needed to meet him.   The defendant told Johnson to come down Franklin St.   Surveillance agents observed Johnson's vehicle drive down the alley behind Banks' house and depart a short time later.

Later that evening, the defendant received a call on 785-375-6704 from 785-512-0333, Dwight Dorian Bivins (call #8802).   Bivens asked the defendant if the defendant had any "base" (meaning crack cocaine).   The defendant responded that he did not.   Banks then got on the phone and Biven asked Banks the same question.   When Banks responded that he did not, Bivens asked, "Not even a little bit?"   Banks said, "no."

3

On the afternoon of March 28, 2013, Anthony Thompson used 785-226-1783 to call an unknown female at 785-209-4155 (call #6953).   Over the course of several calls, Thompson and the woman set up a drug deal.   During the exchanges, however, the defendant took over the calls from Thompson.   When the woman said she had $75 and had been waiting several hours, the defendant gave her instructions on where to meet. It ultimately was the defendant whom surveillance agents saw drive Thompson's car and meet with two females at a liquor store parking lot, apparently exchanging drugs for money.

On March 30, 2013, at approximately 7:56pm, the defendant answered 785-375-6704 and received a call from Michael Asbury using 785-375-3822 (call #9360).   Asbury said he wanted "everything" the defendant had (meaning all the crack cocaine he could get), said he was at the Dollar Store, and said he had $100. The defendant told Asbury he was coming.   Surveillance agents were in the area, however, and they saw Anthony Thompson show up and meet with a person the agents recognized as Michael Asbury.

On the afternoon of April 3, 2013, Anthony Thompson received two sequential calls on 785-226-1783 from Renee Rhyne using 785-727-5196 (call #9193, 9194). During these calls Thompson and Rhyne set up a drug transaction.   Surveillance agents followed, and they saw both Thompson and the defendant show up to make the delivery at Rhyne's residence.

~~On April 6, 2013, at approximately 7:53pm, the defendant used 785-226-1783 (Anthony Thompson's phone) to speak with a person believed to be Richard Verkerke on 785-226-7159 (call #10512).   Richard asked if he could get a 40 (meaning .4 grams of crack cocaine), and the defendant responded that he coul~~d.

On April 19, 2013, at approximately 9:29pm, Thompson used 785-226-2893 to call the defendant at 785-226-1865 (call #739).   Thompson told the defendant that he was about to come to "the Hat" (meaning Manhattan, Kansas) and he was going to "drop" him "a ball" (meaning an eight-ball, or an eighth ounce - 3.5 grams of crack cocaine) and that he wanted $175 for it.   The defendant responded, "alright."

On the afternoon of April 22, 2013, Thompson received a call on 785-226-2893 from 785-307-2456, which was being used by Akwete "Fay" Burd (call #1421). Fay wanted to meet Thompson but was in Manhattan, while Thompson apparently was in Junction City.   Thompson asked Fay why she didn't go through the defendant, and Fay responded that it was because the defendant was at work. The two then set up a deal for $40 worth of crack cocaine and they agreed to meet.   Surveillance agents observed a person they recognized as Fay Burd arrive at the Dollar General Store on 6th Street and meet with Thompson.

Later that same night, Thompson received another call on 785-226-2893 from Fay Burd using 785-307-2456 (call #1491).    Burd asked Thompson if Thompson was in "the Hat" (Manhattan), and she told Thompson she had "like 35" (meaning $35).    Thompson asked her why she didn't call the defendant.    Burd responded that the defendant was at the store and forgot his phone.

On April 26, 2013, at approximately 4:34pm, Thompson used 785-226-2893 to call Lamont Hill at 785-210-9873 (call #2487).    Hill wanted to meet with Thompson.    Thompson told Hill that he just left town and Hill would have to call Thompson's "dude," referring to the defendant by name, at 785-226-1865.

The following evening, the defendant used 785-226-2893 to call Kelly Vargas at 785-375-0822 (call #3113).    Kelly told the defendant she needed "a 4" (meaning .4 grams of crack cocaine), and the defendant asked her where she was.    The two subsequently arranged a delivery at a nearby Taco Bell.

Totaling the foregoing transactions that discuss either a drug amount or a monetary sum results in a calculation of 8.3 grams of crack cocaine with which the defendant was directly and personally involved.    The defendant stipulates that he distributed or attempted to distribute this amount of crack cocaine, and the government will rely on this amount in arguing the defendant's determination of relevant conduct.

    **3.**    **Application of the Sentencing Guidelines.**    The parties request that the United States Sentencing Guidelines (Guidelines) be applied by the Court to calculate the applicable sentence in this case.    The defendant further waives any right to have facts that determine the offense level under the Guidelines alleged in an indictment and found by a jury beyond a reasonable doubt; agrees that facts that determine the offense level will be found by the Court at sentencing by a preponderance of the evidence and agrees that the Court may consider any reliable evidence, including hearsay; and agrees to waive all constitutional challenges to the validity of the Guidelines.

    **4.**    **Relevant Conduct.**    The parties have agreed to the application of the Guidelines and therefore both the government and the defendant understand that any uncharged related criminal activity will be considered as relevant conduct for purposes of calculating the offense

5

level for the Superseding Information, in accordance with United States Sentencing Guidelines

(U.S.S.G.) § 1B1.3.

     **5.**     **Government's Agreements.**    In return for the defendant's plea of guilty as set

forth herein, the United States Attorney for the District of Kansas agrees:

    a.     To dismiss any outstanding charges beyond the Superseding Information to which the defendant is pleading guilty and to not file any additional charges against the defendant arising out of the facts forming the basis for the present Superseding Information;

    b.     To recommend the defendant receive a two (2) level reduction in the applicable offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.   In addition, the government will move at the time of sentencing for the defendant to receive an additional one (1) level reduction for acceptance of responsibility because the defendant timely notified the government of her intention to enter a plea of guilty; and

    c.     To recommend a sentence at the low end of the applicable Guideline range.

The government's obligation concerning its agreements listed in this paragraph is

contingent upon the defendant's continuing manifestation of acceptance of responsibility as

determined by the government.   If the defendant denies or gives conflicting statements as to his

involvement, falsely denies or frivolously contests relevant conduct that the court determines to

be true, willfully obstructs or impedes the administration of justice as defined in U.S.S.G. §

3C1.1 (or willfully attempts to do so), or engages in additional criminal conduct, the government

reserves the right to request a hearing to determine if the defendant has breached this agreement.

In the event the defendant breaches or violates this plea agreement or otherwise fails to

adhere to its terms, the government shall not be bound by this paragraph and may pursue any

additional charges arising from the criminal activity under investigation as well as any perjury,

false statement, or obstruction of justice charges that may have occurred.   The defendant

understands and agrees that in the event he violates this plea agreement, all statements made by

the defendant subsequent to the execution of this plea agreement, any testimony given by defendant before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against the defendant in any and all criminal proceedings.   The defendant waives any rights that might be asserted under the United States Constitution, any statute, Federal Rules of Criminal Procedure 11(f), Federal Rules of Evidence 410, or any other federal rule that pertains to the admissibility of any statements made by the defendant subsequent to this plea agreement.

      6.    **Sentence to be Determined by the Court.**   The defendant understands that the sentence to be imposed will be determined solely by the United States District Judge.   The government cannot and has not made any promise or representation as to what sentence the defendant will receive.

      7.    **Information Provided by Defendant.**   The government agrees not to use new information the defendant provides about the defendant's own criminal conduct except as specifically authorized by U.S.S.G. § 1B1.8.   As such, this information may be revealed to the Court but may not be used against the defendant in determining the defendant's applicable guideline range or departing above his guideline range.   Defendant understands and agrees, however, that under U.S.S.G. § 1B1.8, there shall be no such restrictions on the use of the information:   (1) previously known to the government; (2) revealed to the government by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; or (4) in the event there is a breach of this agreement.

      8.    **Withdrawal of Plea Not Permitted.**   The defendant understands that if the Court accepts this plea agreement but imposes a sentence with which the defendant does not agree, the defendant will not be permitted to withdraw this plea of guilty.

7

9.  **Payment of Special Assessment.**   The defendant understands that a mandatory special assessment of $100 per count of conviction will be entered against him at the time of sentencing.   The burden of establishing an inability to pay the required special assessment lies with the defendant.

10.  **Waiver of Appeal and Collateral Attack.**   The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, conviction, and the components of the sentence to be imposed herein (including the length and conditions of supervised release, as well as any sentence imposed upon a revocation of supervised release).   The defendant is aware that Title 18, U.S.C. § 3742 affords her the right to appeal the conviction and sentence imposed.   By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate by the court.   The defendant also waives any right to challenge a sentence or otherwise attempt to modify or change his sentence or manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, U.S.C. § 2255 [except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)] and a motion brought under Title 18, U.S.C. § 3582(c)(2), and a motion brought under Federal Rule of Civil Procedure 60(b).   In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, the court departs or varies upward from the applicable sentencing guideline range determined by the court or imposes an upward variance.   However, if the United States exercises its right to appeal the sentence imposed as authorized by Title 18, U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received as authorized by Title 18, U.S.C. § 3742(a).

8

Notwithstanding the forgoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.

11.     **Waiver of FOIA Request.**   The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, Title 5, U.S.C. § 552, or the Privacy Act of 1974, Title 5, U.S.C. § 552a.

12.     **Full Disclosure by United States.**   The defendant understands the government will provide to the court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case.   This may include information concerning the background, character, and conduct of the defendant including the entirety of the defendant's criminal activities.   The defendant understands these disclosures are not limited to the count to which the defendant has pleaded guilty.   The government may respond to comments made or positions taken by the defendant or defendant's counsel and to correct any misstatements or inaccuracies.   The government further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.   The defendant also has the right to provide information concerning the offense and to make recommendations to the court and the United States Probation Office.

13.     **Deportation Consequences**.   The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States.   Under federal law, a broad range of crimes are removable offenses.   Removal and other immigration consequences are the subject of a separate proceeding, however, and the

defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status.   Defendant affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

14.   **Parties to the Agreement.**   The defendant understands this plea agreement binds only the defendant and the United States Attorney for the District of Kansas, and that it does not bind any other federal, state, or local prosecution authority.

15.   **No Other Agreements.**   The defendant has had sufficient time to discuss this case, the evidence, and this agreement with his attorney and he is fully satisfied with the advice and representation provided by his counsel.   Further, the defendant acknowledges that he has read the plea agreement, understands it and agrees it is true and accurate and not the result of any threats, duress or coercion.   The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this agreement embodies each and every term of the agreement between the parties.

16.   **Knowing and Voluntary Waiver**.   The defendant acknowledges that he is entering into this agreement and is pleading guilty because he is guilty.   The defendant further admits that no threats or promises of any sort have been made to induce a plea of guilty in this case.   The decision by the defendant to enter a plea of guilty is made after full and careful thought, with the advice of counsel, and with a full understanding of her rights, the facts and circumstances of the case, and the consequences of the plea.   The defendant is entering into this agreement knowingly, freely, and voluntarily.

_____          Date: _14 May 15_
Anthony W. Mattivi, #17082
Assistant United States Attorney


_____          Date: _5/12/2015_
Duston Slinkard
Assistant United States Attorney
Topeka Criminal Coordinator


_____          Date: _5-14-15_
Walter Bernard Taylor
Defendant


_____          Date: _5/14/15_
Kevin Babbit
Attorney for the Defendant

11